UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL DOCKET #15--10254-FDS |
| | ) | |
| PAUL JACKSON | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Paul Jackson committed a crime of betrayal and he violated the trust of those closest to him. Paul Jackson is also dying. It is a virtual certainty that he will be dead in five years and it is more likely than not that he will be dead in one year.

These two real, yet competing, interests are on a collision course and where the balance is struck has irrevocable consequences for Mr. Jackson. Clearly, these interests must be balanced in determining the appropriate sentence, but unlike virtually every other case, the Court's decision on what constitutes sufficient punishment will almost certainly determine whether Mr. Jackson dies in federal prison. For the reasons that follow, Mr. Jackson submits that a sentence of time served followed by a period of supervised release with the first six months on home confinement is minimally sufficient to meet the federal sentencing goals outlined in 18 U.S.C. §3553(a).

## ARGUMENT

Following *United States v. Booker,* 543 U.S.220, 259 (2005) a sentencing court must begin by considering the Guidelines. But, the Guidelines are not the sole, nor even the first among the factors that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable" and must "make an individualized assessment based on the facts presented." *Id.* at 596-7. Indeed, "the Guidelines are

1

only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id.* at 602 (emphasis added). The Supreme Court later emphasized again that the "Guidelines are not only <u>not mandatory</u> on sentencing courts; they are also not to be <u>presumed</u> reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2009) (emphasis in original).

Thus, district courts are now permitted, indeed, directed to consider whether the Sentencing Commission's underlying policy results in a sentence that is unreasonably high. *See United States v. Kimbrough*, 128 S.Ct. 558, 575 (2007); *United States v. Boardman*, 528 F.3d 86 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998).

The First Circuit elaborated on the meaning and breadth of the so-called parsimony principle in *United States v. Yonathan Rodriguez*, 527 F.3d 221 (1st Cir. 2008). In *Rodriguez*, the First Circuit stressed that the Supreme Court ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *Id*. at 228. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is <u>minimally sufficient</u> to achieve the broad goals of sentencing." *Id.* (emphasis added).

Here, the parties and the Probation Department agree the guidelines are 41 – 51 months and the government has agreed to request a sentence of 33 months.

## A.     Mr. Jackson's Criminal Conduct

For over twenty five years, Mr. Jackson worked as a financial advisor. He owned and operated his own company, Paul J. Jackson & Associates. He was very good at his job. Even

those who fell victim to his crime describe him

> "as an excellent investment advisor who went above and beyond normal advisory duties to assist with additional financial guidance without additional compensation….Of the numerous advisors that we employed over the years he was actually the best."

*See* Victim Impact Letter attached to Presentence Report.

He worked hard to make his mark in the investment advisory business. Through diligence and talent, he was able to build a successful business and develop a good reputation. He had many satisfied investors over the years.

Moreover, unlike a large percentage of defendants charged in this court with fraud offenses, Mr. Jackson did not initially design and implement a comprehensive scheme to defraud. He did not set up an entity or establish a scheme the primary purpose of which was to take advantage of anyone who came in contact with him. Far from it. Mr. Jackson built and maintained a successful business for 20 plus years before he made a series of dreadful choices during a particularly stressful period of time in his life.

In stark contrast stand his criminal acts. Starting in 2010, Mr. Jackson told some of his most loyal investors, friends, and family members about certain investment opportunities. Mr. Jackson told a small circle of investors about "opportunities" to invest in Initial Public Offerings for Twitter, Facebook and Alibaba. In reality, Mr. Jackson was not privy to these IPOs. He stole money from his brother-in-law, his sister, father, and close friends and long-time investors. In all, he took roughly 1.4 million from 8 people.

It is important to note, however, that he committed the instant offense not out of a desire for self-enrichment or avarice, but, rather, to support his daughters' equestrian riding. It is clear that the majority, if not the overwhelming majority, of the money he stole went to pay for his

3

daughters' equestrian activities. During the course of his criminal behavior he was paying upwards of $14,000 a month towards these activities. The desire to provide for his daughters and to not disappoint them led him to act in a way that was previously unfathomable to him. One of his victims - his sister, Susan Jackson, - states:

> His motive was solely to support his children in the life they were accustomed to. They are exceptional in equestrian sports, and he was hoping to continue to provide them this lifestyle, at all costs. This being said, I needed to ask my brother why he did this to me, and so many others who were close to him. His answer was heartfelt and sobering. He meant no harm but had gotten caught up in an endless journey to keep his children competing as usual. I cannot imagine how difficult this is for a father to have to end the journey that was so fruitful for his two girls. So as a Dad, he fought to keep their dream alive.

Letter from Susan Jackson attached as part of Exhibit A.

This is the reality not an excuse. For there can be no excuse for stealing the hard earned money of friends and family. There can be no excuse for violating their trust and friendship. It is also a fact, however, that his criminal acts stand in stark contrast with the lawful way he had run his business over the two decades predating his criminal conduct. His criminal acts are also out of character with the way he has lived his life and the values he was taught and exhibited throughout his life. Notwithstanding his criminal conduct, he is a good and decent man. Good, decent people can do bad things. The two are not mutually exclusive and this Court should consider his criminal misdeeds in the larger context of how he generally ran his business and the true values and character he has developed throughout his life.

**B.     Mr. Jackson's Personal History**

    **1.     Family**

Mr. Jackson is 59 years old. He was born and raised in Rhode Island. In 1980 he graduated from Boston College. Mr. Jackson has two daughters: Kara (age 25) and Shae (age 17). He is currently married to Gayla. In 2014, after 30 years of marriage, Gayla told Mr. Jackson that she wanted a divorce. At that time she had no knowledge of Mr. Jackson's criminal activity. Her decision rocked Mr. Jackson and precipitated a downward spiral of depression and mental health issues that are discussed below.

As eluded to above, Mr. Jackson's world revolves around his two daughters and he has spent his adult life encouraging them to be strong, independent women. He is beloved by his daughters and he is acutely aware that his actions have caused them enormous pain and suffering. Kara and Shae write about their father's devotion to them:

> We spend a lot of time with my dad and he has always been there for us, good or bad. If we received a less than expected grade in school, he would tell us to work harder as we had the ability. When we won blue ribbons' he would be so proud of us and would say this is what hard work feels like. Just watching a video on TV or going to the Red Sox's game or talking and laughing around the kitchen table our dad was always there. In all our years our dad has never missed a play at school from pre-school to high school or a soccer match or equestrian competition in which one or both of us were competing, that shows that my dad puts family first a trait we both hope to inherit.

*See* Letter from Kara and Shae Jackson attached as part of Exhibit A. Kara and Shae are also acutely aware that their father's actions combined with his terminal illness may well deprive them of spending any more time with their father. *Id.*

Mr. Jackson is also very close to his father who is 89 years old and in poor health. Despite his own serious medical issues, Mr. Jackson travels down to Rhode Island every week to be with his father and to take him to his medical appointments. Mr. Jackson's father writes that

"[Paul] is also my best friend" and "without him I would be lost!" *See* Letter from Joseph S. Jackson, Sr. attached as part of Exhibit A.

### 2. Mental Health Issues

Mr. Jackson has struggled with depression for the better part of 15 years. For the most part, it did not affect his day-to-day life, relationships, or his ability to work. As stated above, in 2014, Mr. Jackson's wife of 30 years told him she wanted a divorce. Mr. Jackson was shocked and distraught. His feelings of depression became more severe and in December 2014 he attempted to kill himself. He told his family he was traveling to Connecticut on business but instead he went to a hotel and took an overdose of pills. He was admitted to the William Backus Hospital in Norwich, Connecticut for mental health evaluation.

Two months later on February 18, 2015 Mr. Jackson again attempted to kill himself. His daughter, Kara, grew concerned when she could not reach him and tracked his cell phone to his office in Newton. She called the police who found him on the floor of his office with pills lying on the floor and a plastic bag taped in a manner consistent with a suffocation attempt. *See* Newton Police Department Report dated February 18, 2015 attached as Exhibit B. Mr. Jackson was admitted to Newton Wellesley Hospital for two weeks following which he began treatment with Brittany Slater. Ms. Slater has treated him for the past 16 months.

Newton Wellesley Hospital and Ms. Slater have diagnosed him with severe Major Depressive Disorder. Ms. Slater writes as follows:

> Mr. Jackson has shown good ability to cope with his suicidal thoughts over the past year, but still suffers from daily depressive and anxiety symptoms including negative, racing thoughts, trouble breathing/tightness of chest, and feelings of sadness and melancholy. These symptoms have been further exacerbated by Mr. Jackson's cancer diagnosis in November, 2015, for which there is currently no cure.

*See* Letter from Brittany Slater, Licensed Marriage and Family Therapist attached as Exhibit C. Ms. Slater is also of the opinion that incarceration would "severely impact Mr. Jackson's mental capacity as it relates to his depression and anxiety." *Id.* She opines that his mental stability is influenced greatly by his ability to lean on his family in times of increased depression and anxiety and she is concerned that removing "his supports would significantly increase his depression and anxiety and may re-trigger his previous suicidal intentions." *Id.*

Mr. Jackson's mental health is fragile. His diagnosis in the last year with terminal, aggressive prostate cancer has exacerbated his mental health condition. *Id.* According to his mental health provider, a prison sentence, of any length, would substantially interfere with his mental health treatment and derail his efforts to get better. This factor, along with his medical condition detailed below, do not counsel in favor of a rigid application of the sentencing guidelines. Rather, they counsel against a sentence of incarceration based on the very specific circumstances of Mr. Jackson. *See* U.S.S.G. §5H1.3 ("Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.").

### 3. Mr. Jackson's Medical Condition

As stated above, Mr. Jackson suffers from terminal prostate cancer with metastatic disease to his bones. *See* Letter from Doctor Sarah Slater of Mount Auburn Hospital attached as Exhibit D.

United States Sentencing Guidelines §5H1.4 provides as follows:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline

>sentencing range.   However, an extraordinary physical impairment may be reason to impose a sentence below the applicable guideline sentencing range; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

The First Circuit has stated that although departures based upon medical reasons are discouraged, they are "justified where a defendant's medical problems are 'present in unusual kind or degree.'" *United States v. LeBlanc*, 24 F.3d 340, 348 (1st Cir. 1994)(quoting *United States v. Rivera*, 994 F.2d 942, 948 (1st Cir. 1993)).   Admittedly, the bar is high: departures pursuant to § 5H1.4 are limited to cases where "imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs." *United States v. Martin*, 363 F.3d 25, 50 (1st Cir. 2004) (upholding a downward departure of three levels where serious medical conditions including that defendant required a continued steroid therapy made the defendant's health exceptionally fragile).   This is such a case. *See also United States v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000)(downward departure under § 5H1.4 based on health not abuse of discretion where judge concluded that "imprisonment posed a substantial risk to [defendant's] life," Bureau of Prisons letter stating that it could take care of any medical problem "was merely a form letter trumpeting [BOP] capability"); *United States v. Pineyro*, 372 F.Supp.2d 133, 138 (D.Mass. 2005)(departure warranted for defendant with chronic bone ailment where it is a serious and imminent medical threat, which would be made worse by incarceration, and/or which BOP cannot adequately treat). A combination of medical conditions that render a defendant particularly fragile and susceptible to decline in prison, however, is sufficient to warrant departure. Id. at 50. Moreover, "in the case of a seriously infirm defendant home detention may be as efficient and less costly than imprisonment." *United States v. Martin*, 363 F.3d 25, 50 (1st Cir.2004).

Further, a traditional departure for medical reasons is not limited to the consideration of whether this ailment can adequately be treated by the BOP. In *United States v. Jimenez*, 212 F.Supp.2d 214 (S.D.N.Y. 2002) a defendant convicted of illegal reentry received a downward departure from range of 57-71 months because, after the crime was committed she had suffered a brain aneurism, severe memory loss, and psychotic symptoms. The court rejected the position of the government that the decision to depart from the guidelines rested solely on BOP's ability to treat the defendant's ailment. In *United States v. Willis*, 322 F.Supp.2d 76 (D.Mass. 2004) a defendant convicted of tax evasion received a downward departure from 27 months to probation based upon an inordinate number of potentially serious medical conditions and where such conditions would have invariably become worse in prison. There, in response to the government's argument that BOP could provide adequate care for the defendant, the court said "I have never had a case before me in which the Bureau of Prisons suggested that it did not have the capacity to care for a defendant." *Willis*, 322 F.Supp. 2d at 84.

Mr. Jackson's medical condition, diagnoses, and prognosis clearly qualify as an "extraordinary physical impairment" within the meaning of U.S.S.G. §5H1.4. Quite simply, Mr. Jackson is dying; there can be no greater physical impairment. He suffers from an incurable form of prostate cancer that has metastasized to his bones. He has undergone radiation treatment, months of chemotherapy, and hormone therapy. He has "significant issues with pain, suppression of his immune system, infection, nausea, vomiting, and fatigue." Exhibit D. Dr. Slater, his treating oncologist, describes his condition and prognosis as follows:

> Mr. Jackson will continue to require intensive oncologic care for the rest of his life. Patients with aggressive, metastatic prostate cancer have a limited prognosis; fewer than 5% of patients with bone metastases are alive after five years.

9

Exhibit D.

Dr. Slater also opines about the impact incarceration will have on Mr. Jackson's condition:

> In my opinion, if Mr. Jackson was incarcerated, he would likely not have access to the same intensive treatment that he is currently receiving. As such, I worry that incarceration would potentially have a very negative effect on his disease course and further limit his prognosis. I feel that in order to provide the best medical support for Mr. Jackson, he should be allowed to remain in his home so that he can continue to receive his scheduled therapy and aggressive supportive care.

Exhibit D.

Currently, Mr. Jackson's health is in a state of precarious balance. Incarceration will likely irrevocably tip that balance and accelerate Mr. Jackson's death. The costs – human and financial – of incarceration are too great in this case, and this most uncommon and tragic circumstance warrants a departure to home confinement.

## **CONCLUSION**

Mr. Jackson is ashamed and remorseful by his actions in this case. He understands the depth of anger of those he stole from and the irrevocable breach of trust and friendship he engaged in. Unfortunately, all he can do is apologize and try to begin to repay his debt in the time he has left. But, as one of his victims states:

> **Do any of us victims of his crimes or those of you charged with enforcing the law want to cause a dying person to spend his last months in prison when the damage he did was non-violent?**

Victim Impact Letter attached to Presentence Report (emphasis added).

The Court is tasked with answering that question. Mr. Jackson respectfully requests that the answer should be no.

                        PAUL JACKSON
                        By His Attorney

                        */s/ Stylianus Sinnis*
                        Stylianus Sinnis
                        BBO # 560148
                        Federal Defender Office
                        51 Sleeper Street, 5th Floor
                        Boston, MA 02210
                        Tel: 617-223-8061

**CERTIFICATE OF SERVICE**

     I, Stylianus Sinnis, Esquire, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on July 28, 2016.

                        */s/ Stylianus Sinnis*
                        Stylianus Sinnis